FILED
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. CR407-127 |
| | ) | |
| WILLIAM ANTONIO SPARKS, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Defendant has filed a motion to suppress the pistol that forms the basis of the single–count indictment charging him with possession of a firearm by a convicted felon. That pistol, as well as other evidence, was seized by Savannah police officers during a traffic stop and warrantless search of his vehicle. On July 19, 2007, the Court held an evidentiary hearing and received testimony from government witnesses Janessa Stalter and Lara Hannegan, both with the Savannah–Chatham Metropolitan Police Department, and from defendant, who elected to testify in his own behalf. For the reasons that follow, the motion to suppress should be DENIED.

## I. BACKGROUND

At approximately 4:00 p.m. on July 4, 2006, Cpl. Stalter was on routine patrol in downtown Savannah when she observed a vehicle traveling substantially in excess of the posted 30 mile-per-hour speed limit near the intersection of Montgomery and Henry Streets, a high–crime area where there had been a recent spate of drive-by shootings. Cpl. Stalter followed the vehicle in her marked patrol car, and when it stopped at a traffic light, she activated her blue lights and relayed the vehicle's description and tag number to police dispatch.

After the vehicle (a four-door Buick) pulled over, Cpl. Stalter observed the three occupants of the vehicle duck down for a brief instant, behavior which she interpreted as "indicative of" placing something under the seat. Cpl. Stalter instructed the driver (defendant Sparks) to turn off the engine and place the car keys on the roof of the vehicle, and she directed all of the occupants to extend their arms out the window and keep their hands visible. The defendant and his passengers did as they were told. Cpl. Stalter then approached the driver's side of the Buick as Officer Lara Hannegan, who had arrived as backup (and who had been informed of Cpl. Stalter's suspicions that the occupants had just hidden

something under the seat), took position on the passenger's side of the vehicle. When Cpl. Stalter reached the car, she detected the faint odor of burnt marijuana inside the vehicle. She spoke with the driver, who admitted to speeding and estimated that he had been traveling at 45 miles per hour. Stalter obtained defendant's name, address, and date of birth and requested that he produce his license and proof of insurance. Defendant then reached under his seat, and as he did so, both officers heard a "clunk" sound of metal on metal. Cpl. Stalter immediately told defendant to put his hands back outside the window and asked him what was under the seat. When defendant stated that it was his wallet, Cpl. Stalter took hold of his left arm and allowed him to reach back under the seat with his right hand to feel for his wallet. After probing around for a second or two, defendant pulled out his wallet and produced his license. The front seat passenger looked in the glove box and found the proof-of-insurance card.

Cpl. Stalter then asked the occupants of the car whether any of them were on parole or probation. Defendant acknowledged that he was on parole for burglary and gun charges, and the front seat passenger stated that he was on probation for armed robbery. The officers

3

returned to Stalter's patrol car to run a computer check of the information they had obtained and to radio for additional back-up officers, who arrived shortly thereafter. The officers then directed the two passengers to step out of the vehicle and proceeded to pat them down. When Cpl. Stalter directed defendant to exit his vehicle, he protested and became visibly agitated.[1] He then stepped out of the car and submitted to a pat down but stated that he did not want to have a seat in a police car. Cpl. Stalter allowed defendant to have a seat on the sidewalk as she looked under the driver's seat, where she found a Smith & Wesson .38 Special revolver and a pair of fingerless gloves. The officers then placed defendant under arrest and searched the rest of the car, which led to the discovery of another gun inside a shoebox that was lying on the back seat, another pair of gloves, and a small bag containing tobacco and torn cigar paper. Cpl. Stalter also noticed suspected marijuana residue on the floorboard of the vehicle.

---

[1]After learning that defendant was on parole, Cpl. Stalter told defendant that he no longer had any Fourth Amendment rights. Defendant disputed this assertion, and he has attached a copy of his parole conditions, which provide that any "parole officer" could conduct a warrantless search of his person, residence, or automobile. Doc. 27, Ex. B. As the resolution of defendant's suppression motion does not depend upon a finding that he relinquished his Fourth Amendment rights to allow warrantless searches by "police" officers as a condition of parole, the Court will not belabor the record with any further discussion of this red herring.

Defendant contradicted the officers' testimony in several important particulars. Although defendant admitted that he was speeding, he denied that he and the front seat passenger moved around in the car or placed anything under the seat upon the initiation of the traffic stop (although he could not say what the rear seat passenger may have done), denied that he or his passengers had been smoking marijuana in the car, and denied that there had been any "clunk" sound when he reached under his seat. After assessing this testimony, the Court finds the officers' version of the events to be more credible and specifically discounts defendant's statement that he and his front seat companion did not duck down below the seat level as the traffic stop began and that there was no metallic "clunk." The Court further credits Cpl. Stalter's testimony that she smelled the faint odor of marijuana coming from defendant's vehicle; while defendant may be correct that he and his companions had not been smoking immediately prior to the stop, the officer nevertheless detected the lingering odor of marijuana in the car (whatever its origin), and the subsequent search of the vehicle revealed additional evidence corroborating the officer's testimony.[2]

_____

[2]Cpl. Stalter noticed a green leafy residue of suspected marijuana in the car

5

## II.  ANALYSIS

Defendant argues that the stop was "pretextual" and therefore violative of the Fourth Amendment guarantee against unreasonable searches and seizures because "although the officer stopped Defendant Sparks and his passengers for speeding, she already had an unfounded suspicion [of other criminal activity] . . . based on nothing other than their appearances."  Doc. 27, at 5.  Defendant further suggests that the officer employed non-typical procedures for a routine traffic stop by directing defendant to remove his keys and instructing all occupants to place their hands out the windows, and he contends that she unlawfully prolonged the traffic stop by asking questions unrelated to its purpose. Id. at 6.

Defendant's "pretext" argument rests upon a legal theory that has been squarely rejected by the Supreme Court.  "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."  Whren v.

---

during the later search, and while she did not locate a marijuana "blunt" (a hollowed out cigar casing with its tobacco replaced by marijuana), the discovery of the bag containing tobacco and torn cigar paper is consistent with the making of such a blunt (although certainly not definitive evidence of such behavior).

United States, 517 U.S. 806, 809 (1996). The existence of probable cause depends purely on the objective facts available to the officer. "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Id. at 813. For this reason, the Supreme Court has rejected the notion that a traffic stop based on probable cause is constitutionally permissible only if a reasonable officer would have made the stop solely for the purpose of enforcing the traffic laws. Id. at 813-15; see Riley v. City of Montgomery, 104 F.3d 1247, 1252 (11th Cir. 1997) (holding that the constitutional reasonableness of a traffic stop is determined irrespective of the intent of the individual officer or a theoretical "reasonable officer"). Therefore, "a police officer may stop a vehicle '[w]hen there is . . . probable cause to believe the driver is violating any one of a multitude of applicable traffic and equipment regulations' relating to the operation of motor vehicles." United States v. Strickland, 902 F.2d 937, 940 (11th Cir. 1990) (quoting Delaware v. Prouse, 440 U.S. 668 (1979)).

Cpl. Stalter testified that she stopped defendant based on her personal observation that he was speeding in violation of the Georgia traffic laws. See O.C.G.A. § 40-6-182. This observation, which defendant

does not dispute, furnished legitimate grounds to initiate the traffic stop.

As Cpl. Stalter had probable cause to believe a traffic violation had occurred, the stop of defendant's vehicle was entirely proper, and the fact that the officer may have had another, ulterior purpose for the stop is simply irrelevant to the Fourth Amendment inquiry.[3]  See United States v. Holloman, 113 F.3d 192, 194 (11th Cir. 1997) (holding that Whren "conclusively refutes the notion that ulterior motives may invalidate police conduct that is justified on the basis of probable cause to believe that a violation of law has occurred").

---

[3]Cpl. Stalter testified that when she noticed the speeding vehicle, she was aware that there had been numerous drive-by shootings in this area of Savannah and therefore she immediately looked to see if defendant's vehicle was being chased by another car. It is thus conceivable (although there is no testimony or other evidence to this effect) that the officer stopped the vehicle for the dual purpose of enforcing the traffic laws and investigating a mere hunch that there might be some connection between this vehicle and a recent drive-by shooting.  But since it is undisputed that the officer observed the vehicle committing a traffic offense, Cpl. Stalter was entitled to stop the vehicle irrespective of her subjective beliefs, however flimsy or unfounded they may have been.

Defendant further argues that the stop was "based on nothing other than [the] appearances" of defendant and his passengers. Id. at 5.  To the extent that defendant is suggesting that the stop rested upon impermissible racial stereotyping, there is nothing in the record to support such a contention.  Cpl. Stalter testified that she did not even know how many people were in the vehicle when she first observed it speeding, nor is there any evidence that she knew the race of the driver at that time.  But even if the officer had known that the speeder was black, there is a complete absence of any evidence that Stalter selectively enforces the traffic laws by targeting only black speeders or that her decision to stop this particular speeder was based solely on his race.

Nor is there any merit to defendant's contention that the officer exceeded the bounds of the Fourth Amendment by directing the defendant to place his keys on top of the vehicle and instructing all of the occupants to place their hands out the window.

The Supreme Court has recognized that even during a routine traffic stop—where there is no specific reason to suspect that the driver is dangerous or engaged in any criminal activity other than a minor traffic infraction—a police officer is nevertheless exposed to an "inordinate risk . . . as he approaches a person seated in an automobile." Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977). The potential danger to police officers inherent in every roadside stop "is likely to be greater when there are passengers in addition to the driver in the stopped car." Maryland v. Wilson, 519 U.S. 408, 414 (1997). Accordingly, a police officer who lawfully stops a vehicle for a traffic infraction may "'routinely exercise unquestioned command'"[4] of the potentially dangerous situation by ordering both the driver and any passengers to exit their vehicle. Mimms, 434 U.S. at 109, 111 n.6 (officer may order

---

[4] Wilson, 519 U.S. at 414 (quoting Michigan v. Summers, 452 U.S. 692, 702-03 (1981)).

the driver to get out of his vehicle even where he has "no reason to suspect foul play from the particular driver"); Wilson, 519 U.S. at 410 (the holding in Mimms "extends to passengers as well"). In both cases, the Court concluded that the "'legitimate and weighty'" interest in officer safety, Wilson, 519 U.S. at 412 (quoting Mimms, 434 U.S. at 110), outweighed such a *"de minimis"* intrusion upon either the driver's or passenger's liberty interests. Mimms, 434 U.S. at 111 (the incremental intrusion upon the driver's personal liberty occasioned by ordering him out of the car "can only be described as *de minimis*"); Wilson, 519 U.S. at 415 ("the additional intrusion on the passenger is minimal"). The Supreme Court, therefore, has fashioned a bright-line rule that in all traffic stops an officer may "as a matter of course" take the precautionary step of ordering both the driver and any passenger out of the vehicle. Wilson, 519 U.S. at 412 & n.1, 415.

Several courts have built upon the rationale and holdings of Mimms and Wilson to decide that in exercising their authority during a traffic stop police officers may order both the driver and any passenger to remain *in* their vehicle, move from one area to another, keep their hands in view, or take other reasonable action that may vary depending upon

10

the exigencies of the particular circumstances.  United States v. Clark, 337 F.3d 1282, 1288 (11th Cir. 2003) (officer did not violate passenger's Fourth Amendment rights when he ordered him to reenter vehicle and keep his hands visible after officer encountered the passenger's companions fighting in the street).  Rogala v. District of Columbia, 161 F.3d 44, 53 (D.C.C. 1998) (an officer may require a passenger to stay in the stopped vehicle); United States v. Moorefield, 111 F.3d 10, 13 (3rd Cir. 1997) (during a routine traffic stop an officer  does not offend the Fourth Amendment by ordering the driver and passenger to stay in the vehicle with their hands in view); United States v. Stanfield, 109 F.3d 976, 981-83 (4th Cir. 1997) (where a lawfully stopped vehicle has heavily tinted windows,  an officer can open a vehicle door to visually inspect its interior for the purpose of ascertaining whether those inside pose a danger to the officer).  The holdings in these cases are consistent with the bright-line rules announced in Wilson and Mimms, for a police officer's command that the driver and passengers reenter a stopped vehicle, or keep their hands in view, involves the type of "minimal" intrusion that is outweighed by the state's "weighty" interest in officer safety.  Thus, Cpl. Stalter was entitled to direct defendant to put his keys

on the roof of the vehicle and to instruct all occupants to show their hands and to exit the vehicle even without any specific reason to suspect that they posed a threat to her safety.

Cpl. Stalter, however, took the additional step of taking hold of defendant's left arm as he felt under his seat for his wallet, and she further searched both his person and under the driver's seat for weapons once she ordered him out of the vehicle. Of course, there is no per se rule that an officer may routinely restrain or search a motorist who is stopped for a traffic violation, for such a "severe . . . intrusion upon cherished personal security" must be justified by "specific and articulable facts" that the motorist poses a danger to the officer. Terry v. Ohio, 392 U.S. 1, 21, 24-25 (1968). Terry established the now well–familiar principle that a police officer may conduct a pat–down search for his own protection "where he has reason to believe that he is dealing with an armed and dangerous individual." Id. at 27; see United States v. Bonds, 829 F.2d 1072, 1074 (11th Cir. 1987) (a stop and frisk are "separate activities which serve distinct purposes and require distinct justifications" and thus an officer may have reason to frisk an individual who is not the focus of his investigation). There is no requirement that an officer "be

absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 27; United States v. Hunter, 291 F.3d 1302, 1306 (11th Cir. 2002).

In this case, the officer had a reasonable concern for her personal safety that justified the protective measures of placing her hands upon defendant as he reached under his seat, frisking him upon his exiting the vehicle, and searching under the driver's seat for a possible weapon. As soon as Cpl. Stalter stopped the vehicle for speeding, she observed the occupants duck down in a manner characteristic of placing something in the floorboard or under the seat of the car. When she approached the vehicle and spoke with the driver, she smelled the odor of burnt marijuana, which furnished reasonable suspicion to believe that the vehicle occupants were engaged in criminal activity. United States v. Griffin, 109 F.3d 706, 708 (11th Cir. 1997) (officers who smelled odor of marijuana during traffic stop had reasonable suspicion of criminal activity warranting an investigatory detention). When Cpl. Stalter requested defendant's license, both officers heard a metallic "clunk" sound as defendant suddenly reached under his seat for the alleged

purpose of retrieving his wallet. At this point, Cpl. Stalter took hold of defendant's left arm before allowing him to again reach under his seat. This was a reasonable precautionary measure given the officers' legitimate concern that the metallic sound might be a weapon that defendant had just concealed under his seat. Upon asking if defendant or his passengers were on probation or parole,[5] Cpl. Stalter learned that defendant was on parole for burglary and gun charges and that his front–seat passenger was also on probation for a violent felony. This information naturally enhanced the officers' concern that defendant and his companions presented a safety threat. See United States v. Knights, 534 U.S. 112, 120 (2001) (noting that a probationer is more likely to engage in criminal conduct than the average citizen and have more incentive to conceal his wrongdoing). Based on the totality of the circumstances, it was entirely appropriate for Cpl. Stalter not only to order defendant out of his car but also to subject him to a pat–down search for weapons. And since the officer had a reasonable belief that

---

[5]Such a question is entirely appropriate even when posed during a routine traffic stop, United States v. Purcell, 236 F.3d 1274, 1276, 1278 (11th Cir. 2001) (asking a lawfully stopped motorist if he had ever been arrested and requesting his criminal history as part of a routine computer check of his license and registration is not unconstitutional), and such a question is especially appropriate where the officer has reason to suspect that the motorist is dangerous.

defendant posed a danger, she was also entitled to search under defendant's car seat for a possible weapon. Michigan v. Long, 463 U.S. 1032, 1049 (1983) (officer conducting a traffic stop who has reason to believe the driver is dangerous may not only frisk the driver but also search areas of the passenger compartment from which the driver might gain access to a weapon); United States v. Neely, 217 Fed. Appx. 849, 851 (11th Cir. 2007) (unpublished opinion) (officer entitled to search vehicle to ensure his own safety where suspect repeatedly reached under his seat).

"It is well established that officers conducting a traffic stop may 'take such step as [are] reasonably necessary to protect their personal safety' . . ., includ[ing] conducting a protective search of the driver, . . . the passengers, . . . and the vehicle . . . ." Purcell, 236 F.3d at 1277 (citations omitted). In this case the vehicle occupants' furtive movements upon the initiation of the traffic stop and the audible "clunk" sound produced when defendant suddenly reached under his seat, together with the officer's knowledge that defendant was on parole for a burglary and a gun charge, furnished reasonable grounds to suspect that

defendant was armed and dangerous. Cpl. Stalter, therefore, acted appropriately in conducting a protective search for weapons.

Finally, there is no merit to defendant's contention that the officer unduly prolonged the stop beyond the time necessary to process the traffic violation. As the above discussion makes clear, from the outset of the stop the officer reasonably suspected that defendant was potentially dangerous, and after smelling the odor of marijuana, she developed a reasonable suspicion that the vehicle occupants were engaged in criminal activity. The officer was entitled to investigate these concerns independent of the grounds which led to the traffic stop, and therefore she acted properly in pursuing a line of questioning unrelated to the initial stop. See Purcell, 236 F.3d at 1277 (a traffic stop may extend beyond the time necessary to process the traffic violation where "there is articulable suspicion of other illegal activity"); United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999) (an "officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring.").

## III. CONCLUSION

The evidence establishes that there was probable cause for the officer to stop defendant's vehicle for speeding. Upon conducting a lawful traffic stop in a high crime area and noticing the vehicle occupants duck down as she approached, the officer was entitled to take command of the situation and order both the driver and passengers to place their hands out the window and step out of the car. Cpl. Stalter then frisked defendant and conducted a protective search of his vehicle based on her reasonable suspicion that he posed a threat to officer safety. The evidence discovered during this search was lawfully seized, and therefore defendant's motion to suppress should therefore be DENIED.

**SO REPORTED AND RECOMMENDED** this 2nd day of **August, 2007.**

_(signature)_
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA